05-1953-cv
Vietnam Association for Victims of Agent Orange/Dioxin v. Dow Chemical Co.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2006

(Argued:  June 18, 2007                                    Decided: February 22, 2008)

Docket No. 05-1953-cv

---

VIETNAM ASSOCIATION FOR VICTIMS OF AGENT ORANGE, PHAN THI PHI PHI, NGUYEN VAN QUY, Individually and as parent and natural guardian of NGUYEN QUANG TRUNG, THUY NGUYEN THI NGA, His children, DUONG QUYNH HOA, Individually and as administratrix of the estate of her deceased child, HUYNH TRUNG SON, On behalf of themselves and others similarly situated, NGUYEN THANG LOI, TONG THI TU, NGUYEN LONG VAN, NGUYEN THI THOI, NGUYEN MINH CHAU, NGUYEN THI NHAM, LE THI VINH, NGUYEN THI HOA, Individually and as parent and natural guardian of VO THANH TUAN ANH, Her child, VO THANH HAI, NGUYEN THI THU, Individually and as parent and natural guardian of NGUYEN SON LINH and NGUYEN SON TRA, Her children, DANG THI HONG NHUT, NGUYEN DINH THANH, NGUYEN MUOI, HO THI LE, Individually and as administratrix of the estate of her deceased husband HO XUAN BAT, HO KAN HAI, Individually and as parent and natural guardian of NGUYEN VAN HOANG, Her child, and VU THI LOAN,

Plaintiffs-Appellants,

-v.-

DOW CHEMICAL COMPANY, MONSANTO COMPANY, MONSANTO CHEMICAL CO., HERCULES, INC., OCCIDENTAL CHEMICAL CORPORATION, THOMPSON HAYWARD CHEMICAL CO., HARCROS CHEMICALS, INC., UNIROYAL CHEMICAL CO, INC., UNIROYAL, INC., UNIROYAL CHEMICAL HOLDING COMPANY, UNIROYAL CHEMICAL ACQUISITION CORPORATION, C.D.U. HOLDING, INC., DIAMOND SHAMROCK AGRICULTURAL CHEMICALS, INC., DIAMOND SHAMROCK CHEMICAL COMPANY, also known as DIAMOND SHAMROCK REFINING & MARKETING CO., also known as OCCIDENTAL ELECTRO CHEMICAL CORP., also known as MAXUS ENERGY CORP., also known as OCCIDENTAL CHEMICAL CORP., also known as DIAMOND SHAMROCK, DIAMOND SHAMROCK CHEMICAL, also known as DIAMOND SHAMROCK REFINING & MARKETING CO., also known as OCCIDENTAL ELECTRO CHEMICAL CORP., also known as MAXUS ENERGY CORP., also known as OCCIDENTAL CHEMICAL CORP., also known as DIAMOND SHAMROCK, DIAMOND SHAMROCK REFINING AND MARKETING COMPANY, OCCIDENTAL ELECTROCHEMICALS CORPORATION, HOOKER CHEMICAL CORPORATION, HOOKER CHEMICAL FAR EAST CORPORATION, HOOKER

CHEMICALS & PLASTICS CORP., CHEMICAL LAND HOLDINGS, INC., T-H AGRICULTURE & NUTRITION CO., THOMPSON CHEMICAL CORPORATION, also known as THOMPSON CHEMICAL CORP., RIVERDALE CHEMICAL COMPANY,

Defendants-Appellees,

PHARMACIA CORP., formerly known as MONSANTO CO., ULTRAMAR DIAMOND SHAMROCK CORPORATION, MAXUS ENERGY CORP., DIAMOND ALKALI COMPANY, ANSUL INCORPORATED, AMERICAN HOME PRODUCTS CORPORATION, formerly known as AMERICAN HOME PRODUCTS, WYETH, INC., HOFFMAN-TAFF CHEMICALS, INC., ELEMENTIS CHEMICALS, INC., UNITED STATES RUBBER COMPANY, INC., SYNTEX AGRIBUSINESS, INC., ABC CHEMICAL COMPANIES 1-50, SYNTEX LABORATORIES, INC., VALERO ENERGY CORPORATION, doing business as VALERO MARKETING AND SUPPLY COMPANY,

Defendants.

_____

Before: MINER, SACK, and HALL, Circuit Judges.

Appeal from a judgment entered in the United States District Court for the Eastern District of New York (Weinstein, J.) in an action brought by Vietnamese nationals for injuries allegedly sustained by their exposure to Agent Orange and other herbicides manufactured by defendants-appellees and deployed by the United States government during the Vietnam War, to the extent that the judgment: (1) dismisses for failure to state a claim claims pleaded under the Alien Tort Statute; (2) grants summary judgment to defendants-appellants as to claims arising under domestic tort law; and (3) denies the claim for injunctive relief.

Judgment affirmed.

JONATHAN C. MOORE, Moore & Goodman LLP, New York, NY (William H. Goodman and David Milton, Moore & Goodman LLP, New York, NY, Constantine P. Kokkoris, Esq., New York, NY, Frank Davis and Johnny Norris, Davis & Norris LLP, Birmingham, AL, Robert Roden, Shelby Roden LLC, Birmingham, AL, Jonathan Cartee and R. Stan Morris, Cartee & Morris LLC, Birmingham, AL, and Kathleen Melez, Esq., Los Angeles, CA, on the brief), for Plaintiffs-Appellants.

SETH P. WAXMAN, Wilmer Cutler Pickering Hale & Dorr LLP, Washington, DC (Paul R.Q. Wolfson and Leondra R. Kruger, Wilmer Cutler Pickering Hale & Dorr LLP, Washington, DC, Joseph R. Guerra and Maria T. DiGiulian, Sidley Austin LLP, Washington, DC, Richard P. Bress and Matthew K. Roskoski, Latham &Watkins LLP, Washington, DC, James E. Tyrrell Jr., Latham & Watkins, Newark, NJ, and John C. Sabetta and Andrew T. Hahn, Seyfarth Shaw LLP, New York, NY, on the brief), for Defendants-Appellees Monsanto Co., Monsanto Chemical Co., and Pharmacia Corp.

Andrew L. Frey, Charles A. Rothfeld, and Lauren R. Goldman, Mayer Brown Rowe & Maw LLP, New York, NY, James L. Stengel, Laurie Strauch Weiss, and Adam Zimmerman, Orrick, Herrington & Sutcliffe LLP, New York, NY, and Steve Brock and James V. Aiosa, Rivkin Radler LLP, Uniondale, NY, for Defendant-Appellant Dow Chemical Co.

William A. Krohley and William C. Heck, Kelley Drye & Warren LLP, New York, NY, for Defendant-Appellee Hercules, Inc.

Michael M. Gordon, McKee Nelson, New York, NY, for Defendants-Appellants Occidental Chemical Corp., as successor to Diamond Shamrock Chemicals Co.; Maxus Energy Corp.; Tierra Solutions, Inc., f/k/a Chemical Land Holdings, Inc.; and Valero Energy Corp., as successor to Ultramar Diamond Shamrock Corp.

3

Lawrence D'Aloise, Clark, Gagliardi & Miller, White Plains, NY, for Defendants-Appellants Harcros Chemicals, Inc., T-H Agriculture & Nutrition Co., Thompson Chemical Corp., and Thompson Hayward Chemical Co.

Myron Kalish, New York, NY, for Defendants-Appellees C.D.U. Holding, Inc., Uniroyal Chemical Acquisition, Uniroyal Chemical Co., Inc., Uniroyal Chemical Holding Co., and Uniroyal, Inc.

Anne E. Cohen and Anthea E. Roberts, Debevoise & Plimpton LLP, New York, NY, for Defendants-Appellees Hooker Chemical Entities.

Steven H. Hoeft, McDermott Will & Emery LLP, Chicago, IL, and Chryssa V. Valletta, McDermott Will & Emery LLP, New York, NY, for Defendant-Appellant Riverdale Chemical Co.

Jeffrey Sedgwick, Acting Assistant Attorney General, Benton J. Campbell, United States Attorney for the Eastern District of New York, Brooklyn, NY, Mark B. Stern, Sharon Swingle, Attorneys, Appellate Staff Civil Division, U.S. Department of Justice, John B. Bellinger III, Legal Advisor, Department of State, Daniel J. Dell'Orto, Principal Deputy General Counsel, Department of Defense, for Amicus Curiae the United States of America.

Paul R. Friedman, John Townsend Rich, William F. Sheehan, Goodwin Procter LLP, Washington, DC, Robin S. Conrad, Amar D. Sarwal, National Chamber Litigation Center, Inc., Washington, DC, for Amicus Curiae the Chamber of Commerce of the United States of America.

Daniel J. Popeo, Paul D. Kamenar, David Price, Washington Legal Foundation, Washington, DC, for Amicus CuriaeWashington Legal Foundation.

MINER, <u>Circuit Judge</u>:

This appeal challenges the District Court's dismissal of an action brought by a purported class of Vietnamese nationals ("Plaintiffs") on behalf of themselves and all others similarly situated for injuries allegedly sustained by their exposure to Agent Orange and other herbicides manufactured by defendants-appellees United States companies (collectively, "Defendants") and deployed by the United States military during the Vietnam War. Plaintiffs brought this action seeking relief under the Alien Tort Statute, 28 U.S.C. § 1350, which grants the district courts jurisdiction over any civil action by an alien claiming damages for a tort committed in violation of international law or a treaty of the United States. In their Complaint, Plaintiffs alleged that the United States government violated international law by spraying toxic herbicides in areas of South Vietnam from 1962 to 1970 and that Defendants either aided and abetted the government's violations by supplying it with Agent Orange or that they were directly liable in their corporate capacities. Plaintiffs also asserted claims grounded in domestic tort law. In connection with their alleged injuries, Plaintiffs sought money damages as well as injunctive relief in the form of environmental abatement, clean-up, and disgorgement of profits.

Defendants moved to dismiss the Complaint for failure to state a claim upon which relief could be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). In their motion, Defendants contended that the Complaint failed to state a claim under the Alien Tort Statute because it did not allege a violation of any well-defined and universally-accepted rule of international law as required by <u>Sosa v. Alvarez-Machain</u>, 542 U.S. 692 (2004). Defendants also argued that Plaintiffs lacked standing to bring suit, that their claims under the Alien Tort Statute were nonjusticiable under the political question doctrine, and that all of their claims were barred

5

by the government-contractor defense. In addition, Defendants moved for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 to dismiss all claims as barred by the applicable statute of limitations. In the course of the proceedings below, the United States government submitted a Statement of Interest supporting Defendants' position with respect to the issues of international law and on the questions of justiciability and the government-contractor defense.

The District Court made several rulings that were favorable to Plaintiffs, but it ultimately determined that Plaintiffs had failed to allege a violation of international law because Agent Orange was used to protect United States troops against ambush and not as a weapon of war against human populations. The District Court also determined that Plaintiffs' domestic tort law claims were barred by the government-contractor defense, which the court previously had found to bar similar claims brought by United States veterans against some of the same defendants named as defendants-appellees in the companion appeal decided herewith. Accordingly, the court denied Plaintiffs' claims for relief under both international and domestic law and granted Defendants' motion dismissing the Complaint. Because we agree with the conclusions reached by the District Court in this case, we affirm the judgment for the reasons set forth in this Opinion.

**BACKGROUND**

I.    United States Authorization of Herbicide Use in Vietnam

Early in the Vietnam conflict, the United States government began exploring the possibility of using herbicides to deprive enemy forces infiltrating South Vietnam of the benefit of vegetation that provided them with cover and sustenance. In late 1961, the United States

Department of State and the Department of Defense recommended to President Kennedy that the military initiate a defoliation program. President Kennedy soon accepted that recommendation and, in November 1961, approved the launch of military herbicide operations in Vietnam. Operation Trail Dust, as the entire herbicide operation was called, included the United States Air Force Program known as Operation Ranch Hand, which commenced its defoliation spray missions in September 1962; missions targeting crops that sustained enemy forces commenced in November of that same year.

Herbicides were effective in meeting important United States and allied military objectives in Vietnam. As Assistant Secretary of Defense William Lemos explained: "[O]ne of the most difficult problems of military operations in South Vietnam is the inability to observe the enemy in the dense forest and jungle." After summarizing the military's herbicide operations, Admiral Lemos then concluded: "The result is that our forces have been better able to accomplish their mission with significantly reduced U.S. and Vietnamese casualties." Another Assistant Secretary later explained that the "use of . . . herbicides [in Vietnam] was appropriate and had one purpose — to [s]ave the lives of Americans and our allies." The record in this case reveals that the policy of the Department of Defense at that time was to "carefully select[]" crop destruction targets "so as to attack only those crops known to be grown by or from the [Viet Cong] or [North Vietnamese Army]," and the Department "ha[d] issued instructions to the Joint Chiefs of Staff to reemphasize the already existing policy that [chemical herbicides] be utilized only in areas remote from population." Admiral Lemos also stressed that the military had instituted policies intended to ensure that the herbicides were applied only to targets of military significance.

7

The herbicide program nevertheless was controversial, as decision-makers recognized it would be from the outset. But despite concerns that Communist propaganda would characterize the program as a form of germ or chemical warfare, policymakers persisted in the decision to use herbicides in light of their substantial military benefits. They also consistently concluded that the military's use of herbicides in Vietnam was permissible under existing treaties and customary international law. Secretary of State Dean Rusk advised President Kennedy in 1961 that "the use of defoliant does not violate any rule of international law concerning the conduct of chemical warfare and is an accepted tactic of war." In 1969, the United States faced a move in the United Nations General Assembly to resolve whether the 1925 Geneva Protocol, see Geneva Protocol for the Prohibition of the Use in War of Asphyxiating Poisonous or Other Gases and of Bacteriological Methods of Warfare, June 17, 1925, 26 U.S.T. 571, 94 L.N.T.S. 65 (entered into force Feb. 8, 1928, for the United States, Apr. 10, 1975) (the "1925 Geneva Protocol"), banned at least some herbicide use in warfare. The United States delegation rejected that interpretation, claiming that "[c]hemical herbicides . . . which were unknown in 1925, could not be included" within the scope of the prohibitions. Thus, the United States voted against the resolution. In 1970, when President Nixon transmitted the 1925 Geneva Protocol to the Senate for ratification, Secretary of State William Pierce Rogers reiterated that "[i]t is the United States' understanding of the Protocol that it does not prohibit the use in war of . . . chemical herbicides." And in 1975, when President Ford issued Executive Order 11,850 renouncing, "as a matter of national policy, first use of herbicides in war," his accompanying remarks confirmed the consistent position of the United States that "the [1925 Geneva] protocol does not cover . . . chemical herbicides."

Congress was well aware of the herbicide program, and while it denied funds for certain

military initiatives in Southeast Asia of which it disapproved, it never denied funding for herbicides. Instead, it affirmatively ratified herbicide use by appropriating funds specifically for herbicide procurement, and attempts by members of Congress to terminate or constrain the herbicide program failed by wide margins. See S. Rep. No. 91-1016, at 85–87 (1970). During the Senate debate over the Military Procurement Authorization Act of 1971, United States Senators Gaylord Nelson and Charles Goodell introduced an amendment to prohibit the expenditure of funds for any military application of anti-plant chemicals or for the transfer of anti-plant chemicals for use by other countries. The full Senate rejected this measure by a vote of 62-22. Another amendment sought to prohibit the expenditure of funds for the use of chemicals for crop destruction, and that amendment was rejected by a vote of 48-33. Thus, while keenly aware of arguments against the military use of herbicides in Vietnam, Congress continued to appropriate the funds necessary to sustain the program. See 116 Cong. Rec. 30,036–30,227 (1970).

Congress likewise was aware of the controversy over the legality of the use by the United States of herbicides in Vietnam. Indeed, a congressional report observed that, although it was highly desirable that the United States adhere to the 1925 Geneva Protocol, such adherence could be difficult to attain if it would require acceptance of the view that the use of herbicides would violate international law, a position the United States had consistently rejected. See REPORT OF THE SUBCOMM. ON NATIONAL SECURITY, 91ST CONG., CHEMICAL-BIOLOGICAL WARFARE: U.S. POLICIES & INTERNATIONAL EFFECT 5–6, 9 (Comm. Print 1970). Even after the United States terminated the use of herbicides, the government continued to maintain that the 1925 Geneva Protocol did not prohibit the use of herbicides in war. When President Nixon

submitted the Protocol to the Senate for its advice and consent, Secretary of State Rogers explained to the Senate that the United States had decided not to enter a reservation that would preserve its ability to use herbicides, precisely because the United States' position remained that the Protocol did not prohibit "the use in war of . . . chemical herbicides," Letter of Submittal from Secretary of State William P. Rogers to the President (Aug. 11, 1970).  See The Geneva Protocol of 1925:  Hearings Before the Sen. Comm. on Foreign Relations, 92d Cong. 6–7 (1972).

II.        Post-War Adjustments with Vietnam

The Paris Peace Accords of January 1973 ended the United States' participation in the Vietnam War.  After the fall of Saigon in 1975, the United States severed relations with Vietnam and imposed a trade embargo prohibiting most commercial transactions between United States nationals and Vietnamese nationals.  See 31 C.F.R. § 500.201.  President Clinton partially lifted the trade embargo in February 1994, and he fully lifted it in March 1995.  On January 28, 1995, the United States and Vietnam agreed to a settlement of certain outstanding claims between the countries.  This 1995 Agreement covers all claims against either nation arising out of "the nationalization, expropriation, or taking of, or other measures directed against, properties, rights, and interests" of the parties and their citizens during and after the war.  Significantly, the 1995 Agreement makes no provision for reparations or restitution to settle claims arising out of the use by the United States of herbicides, including Agent Orange.

The United States and Vietnam continue to discuss issues arising out of the war in the context of their current diplomatic, economic, trade, aid, and security relationships.[2]  A 2002 Memorandum of Understanding provides for scientists representing both governments to work together to determine the effects, if any, of Agent Orange on people and ecosystems, along with methods and costs of treatment and environmental remediation.  But, to date, the United States never has agreed that it has a legal duty to provide funds or assistance to remediate harms allegedly caused by Agent Orange.

III.    Procurement of Agent Orange

The facts relevant to the manufacture and procurement of Agent Orange are the principal focus of the appeals in the veterans' cases (especially with regard to the government-contractor defense) and are set forth in this Court's opinion resolving the veterans' claims before this Court.  With respect to the instant appeals by Vietnamese nationals, a brief summary of the facts

---

[2] News of the Vietnamese President's visit to the United States in June 2007 confirmed that the United States and Vietnam currently are engaged in diplomatic efforts regarding the Agent Orange issue:

> In the build-up to the hearing, a Vietnamese delegation is touring the United States screening documentaries of disfigurement and other health problems caused by dioxin, a small compound within the 'agent orange' herbicide that is one of the most toxic compounds known . . . .  In the past year, the two countries have set a new tone in dealing with cleaning up toxins from former U.S. air bases where they were stored in barrels marked with an orange stripe.  Government agencies and non-government organizations have plans to start clean-up in the central city of Danang this year.  In late May, [President] Bush signed a bill that provides $3 million toward health and environment issues stemming from dioxin.

Grant McCool, Vietnam Leader Visits U.S. for Trade, Other Issues Weigh, Boston Globe, June 14, 2007.

surrounding the veterans' appeals and additional relevant facts underlying the Vietnamese nationals' claims follows.

The herbicidal properties of the components of Agent Orange, 2,4-dicholoropheno-xyacetic acid (2,4-D) and 2,4,5-tricholorophenoxyacetic acid (2,4,5-T), were identified in research conducted by the United States military during the 1940s. In the 1950s, the military conducted field tests to demonstrate the feasibility of dispensing those substances from aircraft; these dissemination trials, and work on aerial spray systems, laid the groundwork for the defoliation systems used in Vietnam. In 1961, the Advanced Research Projects Agency of the Department of Defense evaluated the feasibility of defoliating tropical vegetation in Vietnam and recommended that appropriate formulations of 2,4-D and 2,4,5-T be exploited for immediate use. In January 1962, the United States Air Force began the operational phase of the defoliation program in South Vietnam, using a substance code-named Agent Purple. Later in 1962, a research team concluded that a 50/50 mixture of 2,4-D and 2,4,5-T was most effective — that formulation became known as Agent Orange. See In re "Agent Orange" Prod. Liab. Litig., 304 F. Supp. 2d 404, 424–31 (E.D.N.Y. 2004).

Formal specifications for 2,4-D and 2,4,5-T were prepared and promulgated by the military. These specifications established the design and specific characteristics of the mixture of 2,4-D and 2,4,5-T that the government had requested. The same specifications also were later used as the basis for the military's procurement of Agent Orange. The government supplied manufacturers with copies of these specifications and incorporated them into the manufacturers' Agent Orange contracts. The government also strictly prescribed the markings that were to be placed on the drums of herbicides manufactured by the Defendants. The names of the various

"Agents" (Agent Orange, Agent Purple, etc.) refer to the three-inch color-coded band that the government required on the outside of the drums containing the relevant herbicide. Aside from that colored band, the government generally prohibited the manufacturers from including any language, markings, or identification on the drums. Id.

In 1966, the government became concerned that the pace of production of Agent Orange was insufficient to meet its projected needs and decided instead to compel production from the manufacturers. In so doing, the government acted under the authority of the Defense Production Act of 1950 ("DPA"), 50 U.S.C. App. §§ 2061–2168 (1951 & Supp. 1983). Section 101 of the DPA authorized the President to "require that performance under contracts or orders . . . which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders." Id. § 2071. The President thereafter delegated that authority to the Secretary of Commerce. 18 Fed. Reg. 6503 (1953). In March 1967, the United States Department of Commerce, expressly invoking Section 101 of the DPA, directed Defendants to accelerate the delivery of existing orders for the defoliant Agent Orange. This directive essentially commandeered all of the Defendants' capacity to produce Agent Orange. In re "Agent Orange" Prod. Liab. Litig., 304 F. Supp. 2d at 424–26.

IV.    End of the Herbicide Program

In June 1966, a government study on the long-term health effects of pesticides, including 2,4,5-T (known as the Bionetics Study), uncovered evidence of teratogenicity (birth defects) in mice. The completed Bionetics Study was delivered to the National Cancer Institute (NCI), a

13

component of the National Institutes of Health, in September 1968, although NCI personnel previously had received progress reports concerning the possible teratogenicity of 2,4,5-T. The government undertook further extensive analyses of the Bionetics Study's data in early 1969, but it did not restrict the ongoing herbicide program in Vietnam. However, upon the public release of the Study in October 1969, the government restricted the use of 2,4,5-T both in the United States (on food crops and around the home) and in Vietnam, limiting its use to areas remote from human populations. On April 15, 1970, the Department of Defense suspended military use of Agent Orange upon evidence of the toxicity of the dioxin component. Subsequently, herbicide spraying for defoliation using Agent White continued a short while, and crop destruction using Agents White and Blue continued through 1970. In January 1971, the last spray mission took place.

V.    Nature of the Complaint & Proceedings Below

Plaintiffs in the instant action include individual Vietnamese nationals residing in both North and South Vietnam, as well as the Vietnamese Association for Victims of Agent Orange ("VAVAO"), a Vietnamese non-profit, non-governmental organization representing persons who were exposed to Agent Orange and other herbicides during the war and whose purpose is to protect the interests of its members and to raise funds for their care and treatment. Plaintiffs brought this action on behalf of themselves and all others similarly situated who sustained injuries as a result of their exposure to dioxin. As the District Court enumerated in extensive detail below, Plaintiffs' alleged injuries included, among other things, miscarriages, birth defects, breast cancer, ovarian tumors, lung cancer, Hodgkins' Disease, and prostate tumors.

Plaintiffs alleged in their September 14, 2004 Amended Complaint that the United States military's use of Agent Orange violated international, domestic, and Vietnamese law and that Defendants either aided and abetted these violations or committed independent violations by fulfilling the military's demand for herbicides. With respect to their claims arising under international law, Plaintiffs alleged that Defendants' actions constituted torts that were cognizable under the Alien Tort Statute ("ATS"),[3] 28 U.S.C. § 1350, and included war crimes, genocide, crimes against humanity, and torture. With respect to their claims arising under domestic and Vietnamese tort law, Plaintiffs alleged that Defendants were liable for assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, wrongful death, and unjust enrichment under the laws of the United States, Vietnam, and the State of New York, and for strict product liability under the laws of the United States and the State of New York. Plaintiffs also sought equitable relief under theories of public nuisance and unjust enrichment. In their prayer for relief, Plaintiffs sought compensatory and punitive damages as well as injunctive relief directing Defendants to provide environmental remediation of the allegedly contaminated areas in Vietnam and to disgorge profits gained from their production and supply of herbicide.

On November 2, 2004, Defendants filed several dispositive motions. They first moved under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the Complaint for failure

---

[3] While our Court has over time referred variously to 28 U.S.C. § 1350 as the Alien Tort Statute, see, e.g., Filartiga v. Pena-Irala, 630 F.2d 876, 880 (2d Cir. 1980), the Alien Tort Act, see, e.g., Kadic v. Karadzic, 70 F.3d 153, 156 (2d Cir. 1998) and the Alien Tort Claims Act, see, e.g., Khulumani v. Barclay Nat'l Bank Ltd., 504 F.3d 254, 258 (2d Cir. 2007), because the Supreme Court has opted in Sosa to refer to § 1350 as the Alien Tort Statute, we think it is preferable to follow that designation.

to state a claim under the ATS. They further moved under Rule 56 for partial summary judgment dismissing all claims as time-barred. With respect to several threshold issues that applied to all international and domestic law claims, Defendants argued that Plaintiffs lacked standing to bring this action and that Plaintiffs had raised claims that were nonjusticiable under the political question doctrine, were time-barred, and were precluded by the government-contractor defense. On the merits, Defendants contended that Plaintiffs failed to allege a violation of international law under the ATS that would meet the standard set forth in Sosa v. Alvarez-Machain, 542 U.S. 692 (2004). Defendants also asserted that any award of injunctive relief requiring remediation of the land in Vietnam would be impracticable. On January 12, 2005, the United States government filed a Statement of Interest supporting Defendants' motion to dismiss the claims under the ATS as nonjusticiable, as barred by the government-contractor defense, and as insufficient to meet the Sosa standard.

At a hearing before the District Court, the parties agreed that the court could consider the motion under Rule 12(b)(6) as a motion for summary judgment against all of the domestic law claims but not against the international law claims. They also agreed that the extensive record assembled by both parties in the related veterans' cases could be relied upon by the court on the summary judgment motions. On March 10, 2005, the District Court issued an opinion and order, which was amended on March 28, 2005. In re Agent Orange Prod. Liab. Litig., 373 F. Supp. 2d 7 (E.D.N.Y. 2005). In its order, the District Court rejected Defendants' contentions and found in Plaintiffs' favor on a number of issues. Initially, although the court cited rulings denying associational standing to pursue damages claims, it held that VAVAO had standing because it also sought injunctive relief. Id. at 49–50. The court next rejected Defendants' position that

16

Plaintiffs' claims were nonjusticiable, id. at 64–78, and it further determined that Plaintiffs' ATS claims were not subject to any statutes of limitation, id. at 59–64, or the government-contractor defense, id. at 85–99.  Moreover, the court concluded that corporations could be liable in a civil action brought under the ATS for a violation of international law and that a claim for aiding and abetting liability was cognizable under the statute.  Id. at 52–59.

Nevertheless, the District Court ultimately determined that none of Plaintiffs' claims could proceed.  With respect to the ATS claims, the court concluded that Plaintiffs had failed to state a cause of action because neither the military's use of Agent Orange nor Defendants' agreement to supply it to the military violated a well-defined and universally-accepted international norm prohibiting the use of herbicides in war.  See id. at 105–38  The court concluded that Plaintiffs' domestic and Vietnamese law claims were barred by the government-contractor defense for the same reasons as set forth in the companion case brought by the U.S. veterans, Isaacson v. Dow Chem. Co., 304 F. Supp. 2d 404 (E.D.N.Y. 2004).  See In re Agent Orange Prod. Liab. Litig., 373 F. Supp. 2d at 15–17.  The court also denied Plaintiffs' claims for injunctive relief, concluding that implementing such relief would be "wholly impracticable" and "could compromise Vietnam's sovereignty."  See id. at 45–46.  Final judgment dismissing the Complaint was entered on March 25, 2005, and this timely appeal by Plaintiffs followed.

**ANALYSIS**

Plaintiffs limit the scope of their appeal to three primary claims.  They first contend that the District Court erred by dismissing their ATS claims, arguing that Defendants violated customary international law norms prohibiting the use of "poisoned weapons" and the infliction

17

of unnecessary suffering.[4] Plaintiffs further argue that the court erred by dismissing their state law claims pursuant to the government-contractor defense without conducting further discovery with respect to Agents White and Blue, and incorporate by reference the same substantive contentions raised in the veterans' appeals. Finally, Plaintiffs assert that the court prematurely dismissed their claims for injunctive relief without the benefit of adequate discovery.

For their part, Defendants contend that Plaintiffs failed to state a cognizable claim under the ATS because the wartime use of herbicides solely for defoliation purposes did not violate international law and that prudential considerations counsel against the recognition of Plaintiffs' claims. Defendants also argue that the ATS claims present nonjusticiable political questions because those claims require an inquiry into executive and legislative judgments relating to the prosecution of a war. In addition, Defendants assert that there is no basis in international law for either corporate liability or civil aiding and abetting liability, and they argue that Plaintiffs' ATS claims are barred by both the government-contractor defense and the statute of limitations. Defendants argue that Plaintiffs' state law claims are preempted by the federal foreign affairs power and the government-contractor defense, and they incorporate by reference the same contentions raised in the veterans' cases. Defendants also argue that the District Court properly denied injunctive relief because it would be impracticable for the court to supervise remediation of 5.5 million acres of distant foreign land. Finally, Defendants argue that the District Court acted within its discretion in denying additional discovery on Plaintiffs' claims relating to Agent White and Agent Blue, because these claims fail for the same reasons as the claims based on

---

[4] Plaintiffs do not appear to advance on appeal their international law claims grounded in genocide, crimes against humanity, and torture. Nor do they appear to press any tort claims under Vietnamese law.

18

Agent Orange and because Plaintiffs had essentially abandoned these claims in the District Court.

I.       Standard of Review

We "review a district court's grant of a motion to dismiss under Rule 12(b)(6) de novo." E & L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23, 28 (2d Cir. 2006). "For the purposes of such review, this Court must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." Gorman v. Consol. Edison Corp., 488 F.3d 586, 591–92 (2d Cir. 2007) (quoting Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002)). We also "review de novo [a] district court's grant of summary judgment, construing the facts in the light most favorable to the non-moving party." Gorman, 488 F.3d at 595 (citing Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006)). "Summary judgment is appropriate only where 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" Gorman, 488 F.3d at 595 (quoting Fed. R. Civ. P. 56(c)). Finally, we review denials of leave to conduct discovery and of injunctive relief for abuse of discretion, which may consist of a ruling based upon an erroneous view of the law or a clearly erroneous assessment of the evidence. See Bano v. Union Carbide Corp., 361 F.3d 696, 716 (2d Cir. 2004); Paddington Partners v. Bouchard, 34 F.3d 1132, 1137 (2d Cir. 1994). See generally Zervos v. Verizon New York, Inc., 252 F.3d 163, 169–71 & n.5 (2d Cir. 2001) (explaining that "[a] district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding or (2) its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions").

II.    Plaintiffs' International Law Claims

A.    Alien Tort Statute and the Sosa Rule

The ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The ATS confers federal subject matter jurisdiction when three independent conditions are satisfied: (1) an alien sues, (2) for a tort, (3) committed in violation of the law of nations or a treaty ratified by the United States. See Filartiga v. Pena-Irala, 630 F.2d 876, 887–88 (2d Cir. 1980). The Supreme Court has clarified that the ATS, which originally was enacted as part of the Judiciary Act of 1789, was jurisdictional in that it "gave the district courts cognizance of certain [then existing] causes of action." Sosa, 542 U.S. at 713–14 (internal quotation marks and citation omitted). The Court was clear that the ATS did not create a statutory cause of action, but the Court just as clearly rejected the notion that "the ATS was stillborn because there could be no claim for relief without a further statute expressly authorizing adoption of causes of action." Id. at 714.

In the broader context, the law of nations has become synonymous with the term "customary international law," which describes the body of rules that nations in the international community "universally abide by, or accede to, out of a sense of legal obligation and mutual concern." Flores v. S. Peru Copper Corp., 414 F.3d 233, 248 (2d Cir. 2003). In ascertaining whether a rule constitutes a norm of customary international law, courts have traditionally consulted "the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law." Filartiga, 630

20

F.2d at 880 (quoting United States v. Smith, 18 U.S. (5 Wheat.) 153, 160–61 (1820)). Sources of international law generally include:

> (a) international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;
> (b) international custom, as evidence of a general practice accepted as law;
> (c) the general principles of law recognized by civilized nations;
> (d) . . . judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of the rules of law.

Filartiga, 630 F.2d at 881 n.8 (citing Statute of the International Court of Justice, art. 38(1), June 26, 1945, 59 Stat. 1055, 1060, 33 U.N.T.S. 993 (entered into force Oct. 24, 1945)); United States v. Yousef, 327 F.3d 56, 100–01 (2d Cir. 2003) (same; also noting that scholarly works are not included among the authoritative sources of customary international law); see also Restatement (Third) of the Foreign Relations Law of the United States § 102 (1987). While not exhaustive, the list of principles that may be said to have "ripened into universally accepted norms of international law," Kadic v. Karadzic, 70 F.3d 232, 243 n.8 (1995), includes the proscriptions against piracy, slave trade, attacks on or hijacking of aircraft, genocide, and war crimes, see Restatement (Third) of the Foreign Relations Law of the United States § 404 (1987). With respect to other types of violations, because customary international law "is created by the general customs and practices of nations and therefore does not stem from any single, definitive, readily-identifiable source," we have advised district courts to exercise "extraordinary care and restraint" in deciding whether an offense will violate a customary norm. Flores, 414 F.3d at 248.

In Sosa, the Supreme Court further cautioned courts to be careful in deciding whether an alleged violation of the law of nations could support an ATS claim. Mindful of the legislative

history, albeit sparse, of the ATS, the Court limited the types of claims that could be recognized under the statute to those bearing the same character as the claims originally contemplated by Congress at the time of drafting — tort claims alleging violations of the law of nations of the sort that would have been recognized within the common law at the time of its enactment. 542 U.S. at 713–14. In the Court's view, "the statute was intended as jurisdictional in the sense of addressing the power of the courts to entertain cases concerned with a certain subject," id. at 714, and "[t]he jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time," id. at 724. In particular, Sosa held that "courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms" that informed the legislation. Id. at 725. Moreover, these "paradigms" encompassed only "those torts corresponding to Blackstone's three primary offenses: violation of safe conducts, infringement of the rights of ambassadors, and piracy." Id. at 724. Although the Court did not circumscribe ATS claims to include only these offenses, it concluded that any claim must reflect the same degree of "definite content and acceptance among civilized nations" as these historical antecedents. Id. at 732. Whether an alleged norm of international law can form the basis of an ATS claim will depend upon whether it is (1) defined with a specificity comparable to these familiar paradigms; and (2) based upon a norm of international character accepted by the civilized world. Id. at 725, 738.[5] We

---

[5] The plaintiff in Sosa was a Mexican national who had been abducted, held overnight, and transported to the United States to face prosecution on charges of the murder and torture of an agent of the federal Drug Enforcement Administration. 542 U.S. at 697–98. Defendant Sosa

accordingly begin our evaluation of Plaintiffs' ATS claims by considering whether they have alleged the violation of an international norm that is sufficiently clear in nature to support subject matter jurisdiction under the ATS.

B.     Plaintiffs' Sources of Customary International Law

In support of their argument that the deployment of Agent Orange violated customary norms prohibiting use of "poisoned weapons" and the infliction of unnecessary suffering, Plaintiffs cite to a number of both domestic and international law sources. Primarily, they rely upon the 1907 Hague Regulations, Annex to the 1907 Hague Convention (IV) Respecting the Laws and Customs of War on Land, October 18, 1907, 36 Stat. 2277, T.S. No. 539 (the "1907 Hague Regulations"); the 1925 Geneva Protocol; and the 1949 Fourth Geneva Convention, The Fourth Geneva Convention relative to the Protection of Civilian Persons in Time of War, August 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 (the "Fourth Geneva Convention"), as well as other sources derived from these documents. The 1907 Hague Regulations, which the United States ratified in 1909, address the range of military operations executed on land and set forth the rules

was a Mexican national who allegedly had participated in the abduction. After being acquitted on the charges against him, the plaintiff brought an action under the ATS against Sosa, and others alleging that his abduction constituted tortious conduct under the ATS. See id. at 698–99. On appeal, the Supreme Court considered whether the law of nations included "a general prohibition of 'arbitrary' detention defined as officially sanctioned action exceeding positive authorization to detain under the domestic law of some government, regardless of the circumstances." Id. at 736. Applying the standard set forth in its opinion, the Court considered several sources of international law and ultimately held that "a single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so well defined as to support the creation of a federal remedy [under § 1350]." Id. at 738. Noting that the plaintiff's claim advanced "an aspiration that exceeds any binding customary rule having the specificity we require," the Court concluded that "[c]reating a private cause of action to further that aspiration would go beyond any residual common law discretion we think it appropriate to exercise." Id. at 738.

23

for conducting hostilities, including the permissible and impermissible means and methods of war, including poisonous weapons and the prohibition of materials calculated to cause unnecessary suffering. The 1907 Hague Regulations also form the basis of much of the language in the national military law handbooks of leading international states, including those of the United States. See U.S. DEP'T OF THE ARMY, FIELD MANUAL: THE LAW OF LAND WARFARE (FM-27-10) 1956 (following the Hague Regulations article by article). By contrast, the Fourth Geneva Convention, which the United States ratified in 1955, principally addresses the treatment of noncombatants in the hands of enemy forces. As such, it is less relevant than the 1907 Hague Regulations. Nevertheless, the parties do not dispute that these treaties, with the exception of the 1925 Geneva Protocol, were in force with respect to the United States during the time frame alleged in the Complaint and that they have achieved the status of customary international law.

The United States did not ratify the 1925 Geneva Protocol until 1975. Accordingly, the Protocol cannot be said to have constituted "a treaty of the United States," 28 U.S.C. § 1350, during the period relevant to this appeal. Even at the time of ratification, the United States and other states reserved the right to respond in kind to a belligerent's first use of poisonous weapons and further limited the treaty obligation to apply only against other treaty parties. The Protocol provides: "[T]he use in war of asphyxiating, poisonous or other gases, and of all analogous liquids, materials or devices, has been justly condemned by the general opinion of the civilized world" and "shall be universally accepted as part of International Law, binding alike the conscience and the practice of nations." Given the nature and scope of the reservations to ratification, however, it would be an impermissible stretch to find that the 1925 Geneva Protocol had acquired the status of binding customary international law during the Vietnam conflict.

24

In support of their argument that they have stated a claim cognizable under the ATS for a violation of the proscription against the use of poisonous weapons, Plaintiffs cite to the March 1945 letter opinion of Major General Myron C. Cramer, Judge Advocate General ("Cramer Opinion"), issued during the Second World War in response to a request from the Secretary of War. In particular, Plaintiffs point to the opinion's conclusion that

> the use of chemical agents . . . to destroy cultivations [sic] or retard their growth, would not violate any rule of international law prohibiting poison gas; upon condition, however, that such chemicals do not produce poisonous effects upon enemy personnel, either from direct contact, or indirectly from ingestion of plants and vegetables which have been exposed thereto. [W]hether [such herbicides] are toxic to such a degree as to poison an individual's system, is a question of fact which should be definitely ascertained.

In addition, Plaintiffs cite to the April 5, 1971 letter opinion of J. Fred Buzhardt ("Buzhardt Opinion") from the Office of General Counsel for the Department of Defense, in response to a request from Senator J.W. Fulbright, Chairman of the Senate Foreign Relations Committee. That opinion relates to the application of Articles 23(a) and (e) of the Hague Regulations of 1907 — which were incorporated into the Department of the Army Field Manual — to the destruction of crops through chemical agents during the Vietnam War:

> [N]either the Hague Regulations nor the rules of customary international law applicable to the conduct of war and to the weapons of war prohibit the use of antiplant chemicals for defoliation or the destruction of crops, provided that their use against crops does not cause such crops as food to be poisoned nor cause human beings to be poisoned by direct contact, and such use must not cause unnecessary destruction of enemy property.

In further support of their claim that the use of herbicides as "poison" violated international law, Plaintiffs rely on the opinions of their experts, Professors George P. Fletcher and Jordan Paust, as well as the works of other international law scholars, who generally contend that the use of chemical or biological warfare violates international law.

25

In support of their claim that Defendants violated the prohibition against unnecessary suffering, Plaintiffs argue that the use of any material object that may have collateral consequences and is not necessary for military purposes is universally prohibited. In short, they contend that the use of Agent Orange was disproportionate to military necessity because it caused unnecessary human suffering. In particular, Plaintiffs assert that Articles 146 and 147 of the Fourth Geneva Convention prohibit "extensive destruction and appropriation of property, not justified by military necessity and carried out unlawfully and wantonly" if committed against protected persons or property. In addition, they argue that Article 50 of that Convention lists as a "grave breach[]" the act of "willfully causing great suffering or serious injury to body or health." Plaintiffs further contend that the 1945 Nuremberg Charter and the 1951 Nuremberg Principles prohibit "war crimes" — namely, violations of the laws and customs of war, including "murder, ill-treatment or deportation to slave labor or for any other purpose of civilian population of or in occupied territory, murder or ill-treatment of prisoners of war or persons on the seas, killing of hostages, plunder of public or private property, wanton destruction of cities, towns or villages, or devastation not justified by military necessity."

C.     Whether Plaintiffs' Claims Are Based on a Universally-Accepted International Norm

1.     Application of Sosa to Plaintiffs' International Law Claims

The sources of international law relied on by Plaintiffs do not support a universally-accepted norm prohibiting the wartime use of Agent Orange that is defined with the degree of specificity required by Sosa. Although the herbicide campaign may have been controversial, the record before us supports the conclusion that Agent Orange was used as a defoliant and not as a poison designed for or targeting human populations. Inasmuch as Agent Orange was intended

26

for defoliation and for destruction of crops only, its use did not violate the international norms relied upon here, since those norms would not necessarily prohibit the deployment of materials that are only secondarily, and not intentionally, harmful to humans. In this respect, it is significant that Plaintiffs nowhere allege that the government intended to harm human beings through its use of Agent Orange. In their Amended Complaint, Plaintiffs recognize that "[t]he stated purpose of the [herbicide] spraying was twofold: (a) to defoliate forests and mangroves to destroy the vegetative cover used by the [Democratic Republic of Vietnam] and [National Liberation Front] troops for concealment, and (b) to destroy crops to deprive them of food." In addition, Plaintiffs acknowledge that the herbicide defoliation campaign "heavily targeted," among other things, vegetative cover adjacent to U.S. military bases and surrounding areas, making it all the more implausible that the government intended to use the herbicide as a poisonous weapon during war.

There is lack of a consensus in the international community with respect to whether the proscription against poison would apply to defoliants that had possible unintended toxic side effects, as opposed to chemicals intended to kill combatants. The prohibition on the use of "poison or poisoned weapons" in Article 23(a) of the 1907 Hague Regulations is certainly categorical, see 36 Stat. 2277, 2301, but its scope is nevertheless undefined and has remained so for a century. As the International Court of Justice ("ICJ") has acknowledged in an authoritative interpretation of Article 23(a), that provision nowhere defines the critical term "poison," and "different interpretations exist on the issue." Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion No. 95, 1996 I.C.J. 226, 248, 255 (July 8, 1996) ("Nuclear Weapons Advisory Opinion"). Indeed, Plaintiffs' own expert conceded that "[t]he concept of 'poison' is not

27

defined." Plaintiffs themselves concede that the authorities "go[] both ways" as to whether the use of herbicides in war, "particularly to destroy crops not intended for use by enemy forces, did violate established norms of international law prior to 1975."

Plaintiffs ignore language from the Cramer Opinion that would permit the use of Agent Orange under the circumstances in which it was in fact used. Notably, that Opinion recognizes that "[a] distinction exists between the employment of poisonous and deleterious gases against enemy human beings, and the use of chemical agents to destroy property, such as natural vegetation, crop cultivations, and the like." Moreover, the Cramer Opinion concludes that "[t]he proposed target of destruction, enemy crop cultivations, is a legitimate one, inasmuch as a belligerent is entitled to deprive the enemy of food and water, and to destroy his sources of supply whether in depots, in transit on land, or growing in his fields." The Buzhardt Opinion, as it relates to permissible uses of herbicides, notes that "General Cramer's opinion clearly encompasses the activities that have taken place in Vietnam and reflects the same position which we have taken" in evaluating the legality of the destruction of crops through chemical agents and the application of the 1925 Geneva Protocol and the 1907 Hague Convention.

According to the Buzhardt Opinion, the prohibition of poisonous weapons "does not effect any prohibition on the use of other weapons and, in particular, it does not prohibit the use of chemical herbicides for depriving the enemy of food and water." That Opinion interprets the 1956 Army Field Manual relied upon by Plaintiffs to permit "measures being taken . . . to destroy, through chemical or bacterial agents harmless to man, crops intended solely for consumption by the armed forces (if that fact can be determined)" but it draws a distinction between herbicides that are intended to destroy crops belonging to enemy soldiers and crops

28

belonging to non-combatants. The Opinion further states as follows: "The thrust of the phrase 'harmless to man' . . . draws attention to Article 23(e) of the Hague Regulations of 1907, wherein combatants are forbidden to employ weapons 'calculated to cause unnecessary suffering.'"

In a further narrowing of the circumstances under which crop destruction is impermissible, the Buzhardt Opinion states:

> Where it cannot be determined whether crops were intended solely for consumption by the enemy's armed forces, crop destruction would be lawful if a reasonable inquiry indicated that the intended destruction is justified by military necessity under the principles of Hague Regulation Article 23(g), and that the devastation occasioned is not disproportionate to the military advantage gained.

The Opinion concludes that the decision to refrain from using herbicides is a matter of United States policy and "is not compelled by the 1907 Hague Regulations, the Geneva Protocol of 1925 or the rules of customary international law." Accordingly, neither the Cramer Opinion nor the Buzhardt Opinion recognizes a universally-accepted prohibition on the use of herbicides.

Plaintiffs' reliance upon the trials at Nuremberg is inapposite for the same reasons. As the District Court correctly noted, the individuals who were found guilty in those criminal proceedings were found to have supplied poisonous Zyklon B gas in World War II concentration camps when "the accused knew that the gas was to be used for the purpose of killing human beings." In re Agent Orange Prod. Liab. Litig., 373 F. Supp. 2d at 94. Because Agent Orange was "not used as [a] means of directly attacking enemy troops," it was not prohibited by Article 23(e)'s proscription of the calculated use of lethal substances against human beings and its use is distinguishable from the context in which Zyklon B gas was used in World War II.

29

Other sources of United States policy lend additional support to that conclusion. In 1961, the Secretary of State wrote to President Kennedy to recommend the use of herbicides in Vietnam because "successful plant-killing ops in [Vietnam], carefully coordinated with and incidental to larger ops, can be of substantial assistance in the control and defeat of the [Vietcong]," and "[t]he use of defoliant does not violate any rule of international law concerning the conduct of chemical warfare and is an accepted tactic of war." In 1969, the United States objected to a proposed United Nations resolution that would have "ma[d]e a clear affirmation that the prohibition contained in the Geneva Protocol applied to the use in war of all chemical, bacteriological and biological agents (including tear gas and other harassing agents) which presently existed or which might be developed in the future." The following year, after the United States ceased its use of Agent Orange upon a study revealing its deleterious effects on humans, the Secretary of State wrote a letter to President Nixon recommending that the President transmit to the Senate for advice and consent the ratification of the 1925 Geneva Protocol. In his letter, the Secretary stated that "[i]t is the United States' understanding of the Protocol that it does not prohibit the use in war of riot-control agents and chemical herbicides." When President Ford ratified the Geneva Protocol in 1975, he clarified that "[a]lthough it is our position that the [P]rotocol does not cover riot control agents and chemical herbicides, I have decided that the United States shall renounce their use in war as a matter of national policy." Moreover, in ratifying the 1925 Geneva Protocol in 1975, the Senate made clear its understanding that the United States' prior use of herbicides in Vietnam had not violated that treaty and that the government intended the Protocol to be only prospective in effect. See Prohibition of Chemical and Biological Weapons: Hearing on S. Res. 48 Before the Senate Comm. on Foreign Relations,

30

93d Cong. 3 (1974) (statement of Senator Humphrey reassuring the Executive Branch that Congress's adoption of the 1925 Geneva Protocol "would in no way reflect on our past practice with regard to chemical agents. The manner in which herbicides and riot control agents were used in Vietnam was fully in accordance with the U.S. [sic] prevailing interpretation of the protocol"). Although Plaintiffs rely on the 1907 Hague Regulations instead of the 1925 Geneva Protocol, it is significant that several nations used poisonous gases during World War I and the contracting parties to the Geneva Protocol found it necessary to adopt such a resolution despite the 1907 Hague Regulations that were in effect.

Plaintiffs' claims that the use of Agent Orange violated the norm of proportionality and caused unnecessary suffering rely upon international agreements requiring intentionality that Plaintiffs cannot establish. Article 23(e) prohibits the use of "arms, projectiles, or material calculated to cause unnecessary suffering." Article 6 of the Nuremberg Charter proscribes "wanton destruction of cities, towns or villages, or devastation not justified by military necessity." Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis Powers, Charter of the Int'l Military Tribunal, Aug. 8, 1945, pt. II, art. 6, 59 stat. 1544, 1574, 82 U.N.T.S. 279 ("Nuremburg Charter"). Article 147 of the Fourth Geneva Convention defines "grave breaches" as "willfully causing great suffering or serious injury to body or health," as well as "extensive destruction and appropriation of property, not justified by military necessity and carried out unlawfully and wantonly." These norms are all simply too indefinite to satisfy Sosa's specificity requirement. As Plaintiffs' expert opined, "norms that depend on modifiers such as 'disproportionate' or 'unnecessary' . . . invite a case-by-case balancing of competing interests . . . [and] black-letter rules become vague and easily

31

manipulated. They lose the definite and specific content that <u>Sosa</u> seems to demand for recovery under the ATS." Defendants cite to the Final Report of the International Criminal Tribunal for the former Yugoslavia (the "ICTY") Prosecutor on the NATO bombing in Kosovo:

> The main problem with the principle of proportionality is not whether or not it exists but what it means and how it is to be applied. It is relatively simple to state that there must be an acceptable relation between the legitimate destructive effect and undesirable collateral effects . . . . It is much easier to formulate the principle of proportionality in general terms than it is to apply it to a particular set of circumstances because the comparison is often between unlike quantities and values.

Final Report to the Prosecutor by the Committee Established to Review the Nato Bombing Campaign Against the Federal Republic of Yugoslavia ¶ 48 (June 8, 2000), <u>reprinted in</u> 39 I.L.M. 1257, 1271 (2000). The principle of proportionality implicates the element of intent, e.g., "calculated to cause unnecessary suffering," "wanton destruction," "willfully causing great suffering," and "carried out unlawfully and wantonly." <u>See</u> 1907 Hague Regulations, art. 23(e). Because Plaintiffs do not allege, nor could they on this record prove, the required mens rea, they fail to make out a cognizable basis for their ATS claim. The purpose behind spraying Agent Orange was only to destroy crops and "to [s]ave the lives of Americans and those of our allies," and not to injure human populations.

Plaintiffs have, at best, alleged a customary international norm proscribing the purposeful use of poison as a weapon against human beings that is inapplicable in this case. We hold that Plaintiffs' claim that "defendants manufactur[ed] and suppl[ied] a[n] herbicide laced with poison" and used as a defoliant fails to satisfy the standard set forth by the Supreme Court in <u>Sosa</u> for recognition of a tort in violation of international law and is, therefore, not cognizable under the ATS. <u>See, e.g.</u>, <u>Alvarez-Machain v. United States</u>, 331 F.3d 604, 620 (9th Cir. 2003)

32

(dismissing cross-border abduction claim, holding: "Because a human rights norm recognizing an individual's right to be free from transborder abductions has not reached a status of international accord sufficient to render it 'obligatory' or 'universal,' it cannot qualify as an actionable norm under the [ATS]. This is a case where aspiration has not yet ripened into obligation."), rev'd sub nom Sosa, 542 U.S. at 692; Flores, 343 F.3d at 160 (holding that "the asserted 'right to life' and 'right to health' are insufficiently definite to constitute rules of customary international law. . . . [I]n order to state a claim under the [ATS], we have required that a plaintiff allege a violation of a 'clear and unambiguous' rule of customary international law"); Beanal v. Freeport-McMoran, 197 F.3d 161, 167 (5th Cir. 1999) (stating that customary international law cannot be established by reference to "abstract rights and liberties devoid of articulable or discernable standards and regulations"). Because we cannot find that Plaintiffs have grounded their claims arising under international law in a norm that was universally accepted at the time of the events giving rise to the injuries alleged, the courts are without jurisdiction under the ATS to consider them. See Sosa, 542 U.S. at 725 ("[C]ourts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized.").

Defendants have argued that "civil aiding-and-abetting liability" may not be imposed on corporate entities for violations of the law of war and that, in any event, prudential considerations should preclude adjudication of Plaintiffs' claims. Because Plaintiffs' claims fail to assert a violation of international law norms that are universally accepted and as specific as the paradigmatic norms identified in Sosa, thereby resulting in a failure to establish a cognizable

33

cause of action that gives rise to jurisdiction under the ATS, we need not address these secondary arguments.[6]

III.     Plaintiffs' Claims Arising under Domestic Law

Plaintiffs argue that the District Court erred in dismissing their state law claims based on the government-contractor defense without discovery on Agents White and Blue, and Plaintiffs incorporate by reference the arguments of appellants United States veterans in the companion case decided herewith. With regard to discovery, Plaintiffs were granted access to the discovery conducted in the companion case brought by the veterans, and the record below shows that additional discovery was conducted on Agents White and Blue. Nevertheless, as set forth in the companion case decided herewith, the government contractor defense operates as a complete bar to Plaintiffs' state law claims. See In re Agent Orange Prod. Liab. Litig., Nos. 05-1760-cv et al., ___ F.3d ___ (2d Cir. Nov. ___, 2007).

IV.     Plaintiffs' Claims for Injunctive Relief

The District Court found that the extraterritorial injunction Plaintiffs sought raised concerns over Vietnam's sovereignty and was rendered "wholly impracticable" by the difficulties involved in enforcing an order of abatement and remediation of vast areas of land over which it had no jurisdiction. In re Agent Orange Prod. Liab. Litig., 373 F. Supp. 2d at 46. Plaintiffs claim that they have adequately alleged an irreparable injury that no legal remedy can

---

[6] After the filing of briefs and oral argument in this appeal, this Court addressed in a different case whether a district court had subject matter jurisdiction over ATS claims alleging that domestic and foreign corporations aided and abetted the government of apartheid South Africa in committing various violations of customary international law. See Khulumani v. Barclay Nat'l Bank, 504 F.3d 254, 260 (2d Cir. 2007) (per curiam) (holding that "in this Circuit, a plaintiff may plead a theory of aiding and abetting liability under the [ATS]").

34

address.  Plaintiffs further claim that any determination regarding the practicalities of enforcing an injunction is premature at this stage in the litigation without further evidentiary developments to guide the District Court in fashioning a remedy.  The facts relied on by the District Court, however, in denying the requested injunctive relief — notably Vietnam's sovereignty and the court's lack of jurisdiction over the relevant territory — are readily apparent, and Plaintiffs offer no argument as to how further development of the record might guide the District Court in fashioning a manageable and enforceable injunctive remedy.  In any event, we find no abuse of discretion in the district court's decision to deny injunctive relief for substantially the same reasons given by the District Court.

**CONCLUSION**

Because of our disposition on the issues of law in this case, we need not address any of the parties' other contentions on appeal.  In accordance with the foregoing, we affirm the judgment of the District Court.